UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRANK SAVITS, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>*v.*<br><br>RCI, LLC, Travel + Leisure Co., and Hilton Grand Vacations Inc.<br><br>*Defendants*. | Case No. 1:26-cv-9409<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Frank Savits ("Savits" or "Plaintiff") brings this Class Action Complaint and Demand for Jury Trial ("Complaint") against Defendants RCI, LLC ("RCI"), Travel + Leisure Co. ("Travel"), and Hilton Grand Vacations Inc. ("HGV") (collectively, "Defendants") to: (1) stop Defendants from making telephone solicitations to consumers who are registered on the National Do Not Call Registry; (2) stop Defendants' practice of placing calls using an artificial or prerecorded voice to the residential telephones of consumers nationwide without their prior express written consent; and (3) obtain redress for all persons injured by Defendants' conduct. Plaintiff, for his Complaint, alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## PARTIES

1. Plaintiff Savits is a natural person and resident of New York City, New York.

2. Defendant Travel + Leisure Co. is a corporation organized and existing under the laws of the State of Delaware and is headquartered in Florida. Travel systematically and continuously conducts business throughout this District, the State of New York, and the United States. Travel maintains its principal offices at 501 W. Church St., Orlando, Florida 32805 and can be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

3. Defendant RCI, LLC is a limited liability company organized and existing under the laws of the State of Delaware. RCI is a timeshare exchange company and a subsidiary of Travel. RCI systematically and continuously conducts business throughout this District, the State of New York, and the United States. RCI maintains its principal offices at 9998 North Michigan Road, Carmel, Indiana 46302 and can be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

4. Defendant Hilton Grand Vacations Inc. ("HGV") is a corporation organized and existing under the laws of the State of Delaware and is headquartered in Florida. HGV systematically and continuously conducts business throughout this District, the State of New York, and the United States. HGV maintains its principal offices at 6355 MetroWest Boulevard, Suite 180, Orlando, Florida 32835 and can be served through its registered agent in Delaware, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

**JURISDICTION AND VENUE**

5. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, as the action arises under the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* (the "TCPA"), which is a federal statute.

6. This Court has personal jurisdiction over Defendants because they maintain a significant presence in this District,1 solicit significant business in this District, have entered into business contracts in this District, and a significant portion of the unlawful conduct alleged in this Complaint occurred in and/or was directed to this District. This Court has personal jurisdiction over Defendants because Plaintiff's claims arise out of telephone calls that Defendants made, or caused to be made, to Plaintiff's New York residential cellular telephone number while Plaintiff resided in this District and was physically present in this District. By directing those calls into New York, Defendants purposefully availed themselves of the privilege of conducting activities in this State. Defendants also market and sell their products and services to New York residents.

7. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants conduct a significant amount of business within this District and because the wrongful conduct giving rise to this case occurred in and/or was directed to this District. Venue is additionally proper because Plaintiff resides in this District.

## THE DEFENDANTS

***Travel + Leisure Co.***

8. Defendant Travel + Leisure Co., formerly known as Wyndham Destinations, Inc., operates what it describes as the world's largest vacation ownership business. As of December 31, 2025, that business had approximately 797,000 owner families and more than 280 vacation club resorts.

[1] For example, Defendant RCI maintains a physical location in this District at The Manhattan Club located at 200 W 56th St, New York, NY 10019. Defendant HGV maintains at least five properties within this District. See https://www.hiltongrandvacations.com/en/resorts-and-destinations/new-york. Defendant Travel + Leisure Co. maintains a property within this District, the Club Wyndham Midtown 45, located at 205 East 45th Street New York, NY 10017. *See* https://clubwyndham.wyndhamdestinations.com/us/en/resorts/wyndham-hotels-resorts/united-states-of-america/new-york/new-york/club-wyndham-midtown-45

9. Travel develops, markets, and sells vacation ownership interests ("VOIs," commonly known as timeshares) under brands including Club Wyndham, WorldMark, Margaritaville Vacation Club, Sports Illustrated Resorts, Eddie Bauer Adventure Club, and Accor Vacation Club. Through its Travel and Membership segment, Travel also operates the RCI vacation exchange network and travel club products such as Travel + Leisure GO.

10. Travel generates revenue principally by selling VOIs, financing those purchases, and collecting recurring management, membership, and transaction fees. In 2025, Travel derived 46% of its revenue from VOI sales, 40% from fee-for-service revenue streams, and 11% from consumer financing.[2] Travel depends heavily on selling additional VOIs to people who already own them. "Upgrade" sales to existing owners accounted for 72% of Travel's net VOI sales in 2025.[3]

11. Travel's sales model depends on getting consumers into sales presentations. Travel uses a variety of marketing channels to induce prospective buyers to tour its resorts and attend sales presentations. It runs telesales and virtual sales programs to solicit additional purchases from existing owners. It also obtains prospects through call transfers and other marketing arrangements with Wyndham Hotels & Resorts and other marketing partners.

12. To market its VOIs, generate sales tours, and maximize revenue from new and upgrade sales, Travel conducts telemarketing, including through its telesales programs. Travel acknowledges in its public filings that its "telemarketing activities are subject to regulation and

---

[2] Travel + Leisure Co., Annual Report (Form 10-K) at 4 (Feb. 18, 2026), https://www.sec.gov/Archives/edgar/data/1361658/000136165826000009/tnl-20251231.htm

[3] *Id.* at 6.

enforcement activities including the federal Telephone Consumer Protection Act and 'do not call' legislation."[4]

***RCI, LLC***

13. Defendant RCI, LLC is a Delaware limited liability company and a subsidiary of Travel.. RCI was founded in 1974 as Resort Condominiums International. It operates what Travel describes as the world's largest vacation exchange network. As of December 31, 2025, that network had approximately 3.3 million paid member families and 3,600 affiliated resorts in 101 countries and territories.[5]

14. RCI markets and operates timeshare exchange programs. In these programs, timeshare owners deposit their use rights with RCI and exchange them for stays at other affiliated resorts. RCI also sells travel club products and other travel services to its members.

15. RCI generates revenue principally from annual membership fees and from fees for exchanges and other transactions. It also charges for add-on products, such as protecting trading power, extending deposits, and combining deposits. RCI acquires most new members when an affiliated timeshare developer pays for a one- or two-year initial membership as part of a timeshare sale. After that initial term, RCI must persuade members to renew directly. RCI also acquires members through direct outreach to consumers, including through telemarketing.

16. RCI markets to its members by telephone. RCI's member terms provide that RCI, "or third parties with the permission of RCI, may offer additional products and services through solicitations and advertisements made by mail, email, telephone (including automated dialing equipment and artificial and prerecorded messages), facsimile machine or other means." The terms

[4] *Id.* at 10.
[5] *Id.* at 3.

also purport to obtain each member's consent to receive such solicitations at the telephone number the member provides to RCI, and state that this consent "continues, whether or not the Member's membership is terminated or expires."[6]

***Hilton Grand Vacations Inc.***

17. Defendant Hilton Grand Vacations Inc. is a Delaware corporation with its principal place of business at 6355 MetroWest Boulevard, Suite 180, Orlando, Florida 32835. HGV is a global timeshare company that operates under a long-term license from Hilton Worldwide Holdings Inc. ("Hilton Worldwide"). As of December 31, 2025, HGV had more than 720,000 members owner families and over 200 properties.[7]

18. HGV develops, markets, sells, and manages timeshare resorts and VOIs. It does so primarily under the Hilton Grand Vacations brand, and also through the Diamond Resorts and Bluegreen Vacations businesses it acquired in 2021 and 2024. VOI purchasers generally become members of HGV's clubs. Membership lets them exchange their ownership for stays across HGV's network and, through an external exchange program, at other timeshare resorts. HGV has advised Hilton Grand Vacations Club members that they "have access to RCI" as their exchange partner.

19. HGV generates revenue principally from VOI sales, consumer financing, resort management fees, and club membership and transaction fees. HGV finances many VOI purchases itself. As of December 31, 2025, its consumer loans carried a weighted-average interest rate of 14.7%. HGV also depends heavily on existing owners: 74% of its 2025 contract sales were to existing owners.[8]

---

[6] RCI, LLC, Terms and Conditions of RCI Weeks Subscribing Membership ¶ 22.g., https://www.rci.com/content/dam/panorama/docs/en_us/disclosure-guides/weeks/rci-weeks-terms-conditions.pdf [https://perma.cc/2BEC-9Z8G] (last visited Oct. 11, 2026)
[7] Hilton Grand Vacations Inc., Annual Report (Form 10-K) at 2 (Feb. 26, 2026).
[8] *Id.* at 5.

20. HGV's sales model depends on generating sales tours. HGV relies on targeted direct marketing and more than 100 sales distribution centers. It also uses marketing kiosks at 142 Bass Pro Shops and Cabela's stores and a marketing alliance with Choice Hotels. HGV has a separate agreement with Hilton Worldwide governing "the transfer of calls from Hilton to us and other related telemarketing services." HGV paid Hilton Worldwide $9 million under that agreement in 2025.[9]

21. To market its VOIs and vacation packages, generate sales tours, and maximize revenue from new and existing-owner sales, HGV conducts telemarketing. HGV acknowledges in its public filings that it is "subject to state and federal telephone consumer protection laws and 'do not call' legislation," and states that it relies in part on "permission-based marketing in which [it] obtain[s] permission to contact prospective purchasers in the future."[10]

## ALLEGATIONS OF FACT

22. As Congress recognized:

> Many customers are outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers…. Banning such automated or pre-recorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion.[11]

23. Senator Larry Pressler, one of the original drafters of the TCPA, explained the need for the TCPA by observing that "[u]nlike other communications media, the telephone commands our instan[t] attention. Junk mail can be thrown away. Television commercials can be turned off.

[9] *Id.* at 12.
[10] *Id.* at 8.
[11] Pub. L. No. 102-243 § 2(6, 12) (1991), codified at 47 U.S.C. § 227.

The telephone demands to be answered." 137 Cong. Rec. S18785 (daily ed. Nov. 27, 1991) (statement of Sen. Pressler).

24. As explained by the Federal Communications Commission ("FCC")[12], the TCPA requires "*prior express written consent* for all autodialed or pre-recorded telemarketing calls to wireless numbers and residential lines." *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* CG No. 02-278, FCC 12-21, 27 FCC Rcd. 1830 ¶ 2 (Feb. 15, 2012).

25. Yet, in violation of this rule, Defendants fail to obtain any prior express written consent to place prerecorded calls to consumers' residential telephone numbers.

26. Telemarketers can easily and inexpensively avoid calling consumers who are registered on the National Do Not Call Registry by "scrubbing" their call lists against the National Do Not Call Registry database. The scrubbing process identifies those numbers on the National Do Not Call Registry, allowing telemarketers to remove those numbers and ensure that no calls are placed to consumers who opt-out of telemarketing calls.

27. To qualify for the regulatory safe harbor, a seller or telemarketer must use a version of the Registry obtained no more than 31 days before the call is made. *See* 47 C.F.R. § 64.1200(c)(2)(i)(D).

28. Additionally, callers can readily identify reassigned numbers. Since November 1, 2021, the FCC has made available a Reassigned Numbers Database that allows a caller to determine whether a telephone number has been permanently disconnected—and therefore may have been reassigned—since the date the caller obtained consent. The FCC established the

[12] The FCC is the federal agency given the administrative authority to interpret and enforce the TCPA. 47 U.S.C. § 227(b)(2).

database after estimating that approximately 35 million telephone numbers are disconnected and made available for reassignment each year. *See Advanced Methods to Target and Eliminate Unlawful Robocalls*, Second Report and Order, CG Docket No. 17-59, FCC 18-177 (Dec. 13, 2018). A caller that queries the database and reasonably relies on an erroneous response is protected by a regulatory safe harbor. 47 C.F.R. § 64.1200(m). Upon information and belief, Defendants do not query the Reassigned Numbers Database, or use any comparable service, before placing their telemarketing calls.

29. Despite the availability of the Reassigned Numbers Database and the obvious lack of consent associated with recycled numbers, Defendants failed (and continue to fail) to take the necessary steps to ensure that their telemarketing calls are made only to consenting recipients.

30. In response to the liability risk associated with the TCPA, numerous commercially available services exist to help companies, such as Defendants, to identify cellular subscribers and otherwise ensure that calls are only made to consenting consumers. For instance, companies such as Infutor, Nextmark List, and Contact Center Compliance advertise their ability to instantly identify and flag disconnected telephone numbers from cellular telephone number data lists on a recurring basis (such as weekly or monthly). This type of service can identify disconnected numbers before they are recycled, thereby alerting mobile marketers that any consent associated with those telephone numbers has been terminated.

31. Despite the FCC's clear guidance, industry guidelines, and the commercial availability of programs that help callers filter out non-consenting numbers, Defendants fail to take the necessary steps to ensure that their calls are placed only to consenting recipients.

32. Rather, in an effort to increase revenue and skirt additional costs, Defendants simply ignore the law when contacting individuals on their residential telephone numbers.

33. Defendants know or should know that their prerecorded calls are placed to non-consenting residential telephone subscribers. Ultimately, Defendants are responsible for verifying telephone number ownership and obtaining consent before placing prerecorded calls to residential telephone subscribers.

34. Defendants were, and are, aware that their unsolicited prerecorded calls were, and are, unauthorized as they fail to obtain prior express written consent before placing those calls to consumers. Ultimately, consumers are forced to bear the costs of receiving these unsolicited prerecorded calls.

35. By placing the unsolicited telephone calls at issue in this Complaint, Defendants caused Plaintiff and the other members of the Classes actual harm and cognizable legal injury. This includes the aggravation and nuisance and invasions of privacy that result from receiving such telephone calls, a loss of value realized for the monies consumers paid to their carriers for the receipt of such telephone calls, and a loss of the use and enjoyment of their phones, including wear and tear to the related data, memory, software, hardware, and battery components, among other harms.

36. In response to Defendants' unlawful conduct, Plaintiff filed this action seeking an injunction requiring Defendants to cease all unsolicited telephone call activities and an award of actual or statutory damages to the members of the Classes under the TCPA together with costs and reasonable attorneys' fees.

**FACTS SPECIFIC TO PLAINTIFF FRANK SAVITS**

37. Plaintiff is the registered account owner of a cellular telephone number, 917-xxx-2591.

38. Plaintiff obtained the 917-xxx-2591 number in or around 2004. Plaintiff has never owned a timeshare, has never been a member or customer of RCI, Travel, or HGV, and has never provided the 917-xxx-2591 number to any Defendant.

39. Plaintiff uses the 917-xxx-2591 number as his personal residential telephone number. The number is not associated with a business, and Plaintiff does not use it for business purposes.

40. The 917-xxx-2591 number has been registered on the National Do Not Call Registry since March 30, 2012.

41. Starting on July 29, 2026, Plaintiff received a series of unsolicited telemarketing calls from, or on behalf of, Defendants.

42. All of the unsolicited telephone calls from Defendants were placed from multiple numbers registered to, belonging to, or utilized by Defendants.

43. On July 29, 2026, at 11:54 a.m., Plaintiff received an unsolicited telephone call from Defendants on the 917-xxx-2591 cellular telephone number from 833-907-9430, a number registered to, belonging to, or utilized by Defendants.

44. The message, which was left on Plaintiff's voicemail, stated:

> Hi, this is Danielle with Picture Perfect Getaways. We are reaching out regarding information related to your travel account. We have reached out multiple times to try to reach you and have been unsuccessful. Our travel partners have given us the ability to extend your offer one final time, and I needed to speak to you before moving forward. This is important. So please stop what you are doing and give us a call at 725-353-0557 or hit your redial button. I'd be glad to walk you through everything. Again, that number is 725-353-0557. Our offices are open from 10 a.m. to 9 p.m. Eastern Time. To opt out, call 888-423-3648, and press 1. I hope to talk with you soon.

45. The following are screenshots taken from Plaintiff's cellular telephone displaying a portion of the aforementioned voicemail:




46. On August 13, 2026, at 5:06 p.m., Plaintiff received an unsolicited telephone call from Defendants on the 917-xxx-2591 cellular telephone number from 866-855-9378, a number registered to, belonging to, or utilized by Defendants.

47. The message, which was left on Plaintiff's voicemail, stated:

> Good afternoon, uh, this is Brandon giving you a call in regards to the Hilton Grand vacation club ownership, uh, and more importantly, the RCI membership. Um, you do have some time that's set to expire. Um, if you're note able to use it, we do have a request for that space. Um we are booking here for the next 2 days. So if you're not gonna use it, please give us a call back and we'll go ahead and help you out and give you your options. Thank you. Have a good day. Bye-bye.

48. The following screenshot is taken from Plaintiff's cellular telephone displaying the aforementioned voicemail:




49. On August 18, 2026, at 5:53 p.m., Plaintiff received an unsolicited telephone call from Defendants on the 917-xxx-2591 cellular telephone number from 833-957-9928, a number registered to, belonging to, or utilized by Defendants.

50. The message, which was left on Plaintiff's voicemail, stated:

> Hi, this is Barbara with resort fulfillment department. We have reached out multiple times to try to reach you and have been unsuccessful. This is regarding your unused travel package. Our travel partners have given us the ability to extend your offer one final time, and I needed to speak to you before moving forward. This is important. So please stop what you are doing and give us a call at 415-449-6169 or hit your redial button. I'd be glad to walk you through everything. Again, that

number is 415-449-6169. Our offices are open from 10 a.m. to 9 p.m. Eastern Time. To opt out, call 877-931-9369, and press 1. I hope to talk with you soon.

51. The following screenshot is taken from Plaintiff's cellular telephone displaying a portion of the aforementioned voicemail:




52. On August 20, 2026, at 5:24 p.m., Plaintiff received an unsolicited telephone call from Defendants on the 917-xxx-2591 cellular telephone number from 833-513-9712, a number registered to, belonging to, or utilized by Defendants.

53. The message, which was left on Plaintiff's voicemail, stated:

Good afternoon, uh, this is Brandon giving you a call in regards to the Hilton Grand

vacation club ownership, uh, and more importantly, the RCI membership. Um, you do have some time that's set to expire. Um, if you're note able to use it, we do have a request for that space. Um we are booking here for the next 2 days. So if you're not gonna use it, please give us a call back and we'll go ahead and help you out and give you your options. Thank you. Have a good day. Bye-bye.

54. The following screenshot is taken from Plaintiff's cellular telephone displaying the aforementioned voicemail:




55. On August 20, 2026, at 5:54 p.m., Plaintiff received an unsolicited telephone call from Defendants on the 917-xxx-2591 cellular telephone number from 833-957-9928, a number registered to, belonging to, or utilized by Defendants.

56. The message, which was left on Plaintiff's voicemail, stated:

Hi, this is Barbara with resort fulfillment department. We have reached out multiple times to try to reach you and have been unsuccessful. This is regarding your unused travel package. Our travel partners have given us the ability to extend your offer one final time, and I needed to speak to you before moving forward. This is important. So please stop what you are doing and give us a call at 415-449-6169 or hit your redial button. I'd be glad to walk you through everything. Again, that number is 415-449-6169. Our offices are open from 10 a.m. to 9 p.m. Eastern Time. To opt out, call 877-931-9369, and press 1. I hope to talk with you soon.

57. The following screenshot is taken from Plaintiff's cellular telephone displaying the aforementioned voicemail:




58. On September 16, 2026, at 3:51 p.m., Plaintiff received an unsolicited telephone call from Defendants on the 917-xxx-2591 cellular telephone number from 877-247-9348, a number registered to, belonging to, or utilized by Defendants.

59. . The message, which was left on Plaintiff's voicemail, stated:

> Hi, this is Anne-Marie with resort fulfillment department. We have reached out multiple times to try to reach you and have been unsuccessful. This is regarding your unused travel package. Our travel partners have given us the ability to extend your offer one final time, and I needed to speak to you before moving forward. This is important. So please stop what you are doing and give us a call at 725-220-0796 or hit your redial button. I'd be glad to walk you through everything. Again, that number is 725-220-0796. Our offices are open from 10 a.m. to 9 p.m. Eastern Time. To opt out, call 877-239-7228, and press 1. I hope to talk with you soon.

60. The following screenshot is taken from Plaintiff's cellular telephone displaying the aforementioned voicemail:




61. On September 22, 2026, at 11:37 a.m., Plaintiff received an unsolicited telephone call from Defendants on the 917-xxx-2591 cellular telephone number from 877-631-8590, a number registered to, belonging to, or utilized by Defendants.

62. The message, which was left on Plaintiff's voicemail, stated:

Hi, this is Hope with resort fulfillment department. We have reached out multiple times to try to reach you and have been unsuccessful. This is regarding your unused travel package. Our travel affiliates have given us the ability to extend your offer one final time, and I needed to speak to you before moving forward. This is important. So please take a minute to give us a call at 725-337-5058 or hit your redial button. I'd be glad to walk you through everything. Again, that number is 725-337-5058. Our offices are open from 10 a.m. to 9 p.m. Eastern Time. To opt out, call 877-239-7228, and press 1. I hope to talk with you soon.

63. The following is a screenshot taken from Plaintiff's cellular telephone displaying the aforementioned message:



64. On September 22, 2026, at 2:40 p.m., Plaintiff received an unsolicited telephone call from Defendants on the 917-xxx-2591 cellular telephone number from 631-268-3410, a number registered to, belonging to, or utilized by Defendants.

65. The caller stated:

> Hi, good afternoon, my name is Shirley. I am calling in regards to your RCI membership access with your Hilton timeshare ownership. How are you doing today?

66. The following is a screenshot taken from Plaintiff's cellular telephone displaying the aforementioned message:




67. On September 29, 2026, at 10:42 a.m., Plaintiff received an unsolicited telephone call from Defendants on the 917-xxx-2591 cellular telephone number from 844-552-1952, a number registered to, belonging to, or utilized by Defendants.

68. The message, which was left on Plaintiff's voicemail, stated:

> Hi, this is Anne-Marie with resort fulfillment department. We have reached out multiple times to try to reach you and have been unsuccessful. This is regarding your unused travel package. Our travel partners have given us the ability to extend your offer one final time, and I needed to speak to you before moving forward. This is important. So please stop what you are doing and give us a call at 725-220-0796 or hit your redial button. I'd be glad to walk you through everything. Again, that

number is 725-220-0796. Our offices are open from 10 a.m. to 9 p.m. Eastern Time. To opt out, call 877-239-7228, and press 1. I hope to talk with you soon.

69. The following is a screenshot taken from Plaintiff's cellular telephone displaying the aforementioned message:




70. Each of the calls was made to encourage the purchase or rental of property, goods, or services, including travel packages, vacation offers, and timeshare-related services, and therefore constituted a "telephone solicitation" under 47 U.S.C. § 227(a)(4) and "telemarketing" under 47 C.F.R. § 64.1200(f). The messages urged Plaintiff to call back to claim a time-limited

"offer" or "travel package," to make arrangements for timeshare time "set to expire," or to discuss RCI membership access.

71. Plaintiff has never provided Defendants with consent of any kind, written or otherwise, to receive calls on the 917-xxx-2591 number, and has never had an established business relationship with any Defendant.

72. By placing unauthorized telephone calls as alleged herein, Defendants have caused consumers actual harm in the form of annoyance, nuisance, and invasion of privacy. In addition, the telephone calls disturbed Plaintiff's use and enjoyment of his phone, in addition to the wear and tear on the phone's hardware (including the phone's battery) and the consumption of memory on Plaintiff's phone.

73. In order to redress these injuries, Plaintiff, on behalf of himself and the other members of the Class, brings suit under the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq*.

74. On behalf of the Class, Plaintiff seeks an injunction requiring Defendants to cease placing unsolicited prerecorded calls, and to further cease placing telephone solicitations to phone numbers listed on the National Do Not Call Registry, and an award of actual or statutory damages to the class members, together with costs and reasonable attorneys' fees.

**DEFENDANTS' LIABILITY FOR TELEMARKETING CALLS**

75. Defendants are all a "person," as defined by 47 U.S.C. § 153(39).

76. The FCC is tasked with promulgating rules and orders related to enforcement of the TCPA. *See* 47 U.S.C. § 227(b)(2).

77. The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *See In re Rules & Regulations Implementing the TCPA*, 10 FCC Rcd. 12391, 12397 (1995).

78. In its January 4, 2008 ruling, the FCC reiterated that a company on whose behalf a telephone call is made bears the responsibility for any violations. *In re Rules and Regulations Implementing the TCPA*, CG Docket No. 02-278, FCC 07-232, Declaratory Ruling, ¶ 10 (Jan. 4, 2008).

79. On May 9, 2013, the FCC confirmed this principle in a Declaratory Ruling holding that sellers such as RCI, Travel, and HGV may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*In re Joint Petition Filed by DISH Network*, 28 FCC Rcd. 6574, 6588 (¶ 37) (2013) ("May 2013 FCC Ruling") (internal citations omitted).

80. More specifically, the May 2013 FCC Ruling held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. *Id.* at 6586 (¶ 34).

81. The May 2013 FCC Ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.* at 6587 n.107.

82. The May 2013 FCC Ruling further clarifies the circumstances under which a telemarketer has apparent authority:

> [A]pparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

*Id.* at 6592 (¶ 46)

83. RCI, Travel, and HGV are legally responsible for ensuring that the company that made the calls complied with the TCPA, even if RCI, Travel, and HGV did not themselves make the calls.

84. RCI, Travel, and HGV knowingly and actively accepted business that originated through the illegal telemarketing calls from the company that made the calls.

85. In fact, RCI, Travel, and HGV accepted the business from illegal calls from third party telemarketers working on their behalf, even though they had previously received complaints alleging that the third parties working on their behalf were violating the TCPA.

86. Despite these facts, RCI, Travel, and HGV have continued to fail to monitor the third parties operating on their behalf.

87. By hiring a company to make calls on their behalf, RCI, Travel, and HGV "manifest[ed] assent to another person … that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency.

88. Moreover, RCI, Travel, and HGV maintained interim control over the actions of the parties that made the calls.

89. For example, RCI, Travel, and HGV had absolute control over whether, and under what circumstances, they would accept a customer.

90. Furthermore, RCI, Travel, and HGV had day-to-day control over the actions of the calling parties, including the ability to prohibit them from calling consumers who are registered on the National Do Not Call Registry.

91. RCI, Travel, and HGV also gave interim instructions to the companies that made the calls by providing the volume of calling and contracts it would purchase.

92. Finally, the May 2013 FCC Ruling states that called parties may obtain "evidence of these kinds of relationships … through discovery, if they are not independently privy to such information." *Id.* at 6592-593 (¶ 46). Moreover, evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 (¶ 46).

## CLASS ALLEGATIONS

93. Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of himself and all others similarly situated and seeks certification of the following Classes ("the Class"):

> **Do Not Call Registry Class:** All persons in the United States whom, from four years before the filing of this Complaint through the date of class certification: (1) Defendants (or a third person acting on behalf of Defendants) called more than one time on his/her residential telephone number; (2) within any 12-month period; (3) where the residential telephone number had been listed on the National Do Not Call Registry for at least thirty-one days; and (4) for the purpose of encouraging the purchase or rental of property, goods, or services.

> **Prerecorded Call Class:** All persons in the United States whom, from four years before the filing of this Complaint through the date of class certification: (1) Defendants (or a third person acting on behalf of Defendants) called; (2) using an artificial or prerecorded voice;(3) for the same purpose Plaintiff was called.

> **Misidentification Class**: All persons in the United States whom, from four years before the filing of this Complaint through the date of class certification: (1) Defendants (or a third person acting on behalf of Defendants) called more than one time on his/her residential telephone number; (2) within any 12-month period; (3) where the caller identified the company responsible for the calls as "resort fulfillment department," or "Picture Perfect Getaways" and/or did not identify the company responsible for the calls; and (4) for the purpose of encouraging the purchase or rental of property, goods, or services.

94. The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons. Plaintiff anticipates the need to amend the definitions of the Classes following class discovery, including discovery revealing how Defendants claim they obtained prior express consent to place prerecorded calls to the Plaintiff.

95. **Numerosity**: The exact number of members within the Classes is unknown and not available to Plaintiff at this time, but it is clear that individual joinder is impracticable. On information and belief, Defendants have placed unsolicited calls to hundreds or thousands of consumers who fall into the definition of the Classes. Members of the Classes can be identified through Defendants' records and/or the records of third parties.

96. **Typicality**: Plaintiff's claims are typical of the claims of other members of the Classes in that Plaintiff and the members of the Class sustained damages arising out of Defendants' uniform wrongful conduct, namely their unauthorized telemarketing calls. Plaintiff is a member of the Classes defined herein, and if Plaintiff is able to recover for the claims set forth in this Complaint then the other Class Members will have a right to recover as well.

97. **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced in complex class actions, including class actions under the TCPA and related statutes. Plaintiff has no conflicts with or interests antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiff.

98. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not necessarily limited to the following:

a) Whether Defendants' conduct constitutes a violation of the TCPA;

b) Whether Defendants, or third parties acting on their behalf, made calls to telephone numbers registered on the National Do-Not-Call registry.

c) Whether members of the Classes are entitled to statutory and treble damages based on the willfulness of Defendants' conduct;

d) Whether Defendants obtained prior express consent to contact any class members;

e) Whether the persons who placed the calls were acting on behalf of Defendants;

f) Whether the calls failed to properly identify the person or entity on whose behalf they were made;

g) Whether Defendants' calls constitute telemarketing; and

h) Whether Defendants' violations were knowing and willful.

99. **Superiority:** This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all parties is impracticable, and the damages suffered by the individual members of the Classes will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. Thus, it would be virtually impossible for the individual members of the Classes to obtain effective relief from Defendants' misconduct. Even if members of the Classes could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort and expense will be fostered and uniformity of decisions ensured.

100. Adequate notice can be given to the members of the Classes directly using information maintained in Defendants' records and/or the records of third parties or through notice by publication.

## FIRST CAUSE OF ACTION

**Telephone Consumer Protection Act**
**(Violation of 47 U.S.C. § 227(c)(5))**
**(On Behalf of Plaintiff and the Do Not Call Registry Class)**

101. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

102. 47 U.S.C. § 227(c) provides that any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may" bring a private action based on a violation of said regulations, which were promulgated to protect telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object.

103. The TCPA's implementing regulation, 47 C.F.R. § 64.1200(c), provides that "[n]o person or entity shall initiate any telephone solicitation" to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the federal government."

104. 47 C.F.R. § 64.1200(e), provides that § 64.1200(c) and (d) "are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers to the extent described in the Commission's Report and Order, CG Docket No. 02-278, FCC 03-153, 'Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,'" which the Report and Order, in turn, provides as follows:

> The Commission's rules provide that companies making telephone solicitations to residential telephone subscribers must comply with time of day restrictions and

> must institute procedures for maintaining do-not-call lists. For the reasons described above, we conclude that these rules apply to calls made to wireless telephone numbers. We believe that wireless subscribers should be afforded the same protections as wireline subscribers.

105. 47 C.F.R. § 64.1200(d) further provides that "[n]o person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:

> (1) Written policy. Persons or entities making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.
>
> (2) Training of personnel engaged in telemarketing. Personnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.
>
> (3) Recording, disclosure of do-not-call requests. If a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities making calls for telemarketing purposes (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. This period may not exceed thirty days from the date of such request . . . .
>
> (4) Identification of sellers and telemarketers. A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges.
>
> (5) Affiliated persons or entities. In the absence of a specific request by the subscriber to the contrary, a residential subscriber's do-not-call request shall apply to the particular business entity making the call (or on whose behalf a call is made), and will not apply to affiliated entities unless the consumer reasonably would expect them to be included given the identification of the caller and the product being advertised.

> (6) Maintenance of do-not-call lists. A person or entity making calls for telemarketing purposes must maintain a record of a consumer's request not to receive further telemarketing calls. A do-not-call request must be honored for 5 years from the time the request is made.

106. Defendants violated 47 C.F.R. § 64.1200(c) by initiating, or causing to be initiated, telephone solicitations to residential telephone subscribers, such as Plaintiff and the Do Not Call Registry Class members, who registered their respective telephone numbers on the National Do Not Call Registry, a listing of persons who do not wish to receive telephone solicitations that is maintained by the federal government.

107. Defendants also violated 47 C.F.R. § 64.1200(d)(4) because some or all of the calls did not provide the called party with the actual name of the person or entity on whose behalf the call was being made. The callers identified themselves, if at all, only as "resort fulfillment department," "Picture Perfect Getaways," or by a first name.

108. Defendants placed more than one unsolicited telephone call to Plaintiff and members of the Do Not Call Registry Class within a 12-month period without their prior express invitation or permission and without an established business relationship. Plaintiff and members of the Do Not Call Registry Class never gave Defendants signed, written permission to receive telephone solicitations, and/or Defendants do not have a current record of such permission.

109. Defendants violated 47 U.S.C. § 227(c)(5) because Plaintiff and the Do Not Call Registry Class received more than one telephone call in a 12-month period made by or on behalf of Defendants in violation of 47 C.F.R. § 64.1200, as described above. As a result of Defendants' conduct as alleged herein, Plaintiff and the Do Not Call Registry Class suffered actual damages and, under section 47 U.S.C. § 227(c), are each entitled, *inter alia*, to receive up to $500 in damages for each such violation of 47 C.F.R. § 64.1200.

110. To the extent Defendants' misconduct is determined to be willful and knowing, the Court should, pursuant to 47 U.S.C. § 227(c)(5), treble the amount of statutory damages recoverable by the members of the Do Not Call Registry Class.

## SECOND CAUSE OF ACTION

**Telephone Consumer Protection Act**
**(Violation of 47 U.S.C. § 227(b)(1))**
**(On Behalf of Plaintiff and the Prerecorded Call Class)**

111. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

112. Defendants and/or their agents placed unsolicited calls to residential telephone numbers belonging to Plaintiff and the other members of the Prerecorded Call Class.

113. These calls were made without the prior express written consent of the Plaintiff and the other members of the Prerecorded Call Class to receive such calls.

114. These calls, including those to Plaintiff, utilized an artificial or prerecorded voice.

115. To the extent prior written express consent was required, Defendants failed to obtain prior written express consent that disclosed to the consumer that agreeing to receive prerecorded calls was not a condition of purchase or use of any goods or service. Neither was oral consent provided.

116. Defendants have, therefore, violated 47 U.S.C. § 227(b)(1)(B). As a result of Defendants' conduct, Plaintiff and the other members of the Prerecorded Call Class are each entitled to, under 47 U.S.C. § 227(b)(3)(B), a minimum of $500.00 in damages for each violation of such act.

117. In the event that the Court determines that Defendant's conduct was willful and knowing, it may, under 47 U.S.C. § 227(b)(3)(C), treble the amount of statutory damages recoverable by Plaintiff and the other members of the Prerecorded Call Class.

## THIRD CAUSE OF ACTION

**Telephone Consumer Protection Act**
**(Violation of 47 U.S.C. § 227(c))**
**(On Behalf of Plaintiff and the Misidentification Class)**

118. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

119. Defendants and/or their agents placed numerous calls for telemarketing purposes to telephone numbers belonging to Plaintiff and the other members of the Misidentification Class.

120. Defendants misrepresented their identity to conceal the illegal conduct.

121. Defendants did so despite not training their personnel on the TCPA's identification requirements.

122. Defendants also failed to honor do-not-call requests.

123. Defendants made two or more telemarketing calls to Plaintiff and the other members of the Misidentification Class Members' telephone numbers in a 12-month period.

124. Plaintiff and the other members of the Misidentification Class are entitled to an award of $500 in statutory damages per telephone call pursuant to 47 U.S.C. § 227(c)(5).

125. To the extent Defendants' misconduct is determined to be willful and knowing, the Court should, pursuant to 47 U.S.C. § 227(c)(5), treble the amount of statutory damages recoverable by the members of the Misidentification Class.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Frank Savits, individually and on behalf of the Class, prays for the following relief:

1. An order certifying this case as a class action on behalf of the Classes as defined above; appointing Plaintiff Savits as the representative of the Classes and appointing his attorneys as Class Counsel;

2. An award of actual or statutory damages, whichever is greater, all to be paid into a common fund for the benefit of the Plaintiff and the Classes;

3. An order declaring that Defendants' actions, as set out above, violate the TCPA;

4. An order requiring Defendants to identify any third party involved in the calling as set out above, as well as the terms of any contract or compensation arrangement they have with such third parties;

5. An injunction requiring Defendants to cease all unsolicited calling and all telephone solicitations to numbers listed on the National Do Not Call Registry, and otherwise protecting the interests of the Classes;

6. An injunction prohibiting Defendants from contracting with any third-party for marketing purposes until they establish and implement policies and procedures for ensuring the third-party's compliance with the TCPA;

7. An injunction prohibiting Defendants from conducting any future telemarketing activities until they have established an internal Do Not Call List as required by the TCPA;

8. An award of reasonable attorneys' fees and costs to be paid out of the common fund prayed for above from defendants and/or their insurers; and

9. Such further and other relief as the Court deems necessary.

**JURY DEMAND**

Plaintiff requests a trial by jury of all claims that can be so tried.

Respectfully submitted,

Dated: October 27, 2026

**WOLF POPPER LLP**

By: *S/ Chet B. Waldman*

Chet B. Waldman
Adam T. Savett*
Timothy D. Brennan
WOLF POPPER LLP
570 Lexington Ave.
New York, NY 10022
Tel: (212) 759-4600
Email: cwaldman@wolfpopper.com
asavett@wolfpopper.com
tbrennan@wolfpopper.com

Max S. Morgan*
THE WEITZ FIRM, LLC
1515 Market Street, #1100
Philadelphia, PA 19102
Tel: (267) 587-6240
Fax: (215) 689-0875
Email: max.morgan@theweitzfirm.com

*application for *pro hac vice* admission forthcoming

Attorneys for Plaintiff and the Putative Classes